REES *v.* CITY OF WATERTOWN.

Although a *mandamus*, and *alias mandamus*, and *pluries mandamus*, commanding a city to levy and collect a tax upon the taxable property of its citizens in it, to pay judgments which the relator in the mandamus has obtained against it, have all, in consequence of the devices of the city authorities, such as resignation of their offices, &c., proved unavailing to compel the levy and collection of the tax, and though " the prospect of future success" by the same writ "is perhaps not flattering," the Federal courts sitting in equity do not possess power to appoint the marshal to levy and collect the tax, nor to subject the taxable property situate within the corporate limits of the city in any way to an assessment in order to pay the judgment.

APPEAL from the Circuit Court for the Western District of Wisconsin; the case being thus:

Rees, a citizen of Illinois, being owner of certain bonds issued under authority of an act of the legislature of the State

of Wisconsin, by the city of Watertown, in that State, to the Watertown and Madison Railroad Company, and by the company sold for its benefit, brought suit in the Circuit Court of the United States for the District of Wisconsin, against the city, and, in 1867, recovered two judgments for about $10,000.

In the summer of 1868 he issued executions upon the two judgments thus obtained, which were returned wholly unsatisfied.

In November of the same year he procured from the United States Circuit Court a peremptory writ of mandamus, directing the city of Watertown to levy and collect a tax upon the taxable property of the city, to pay the said judgments; but before the writ could be served, a majority of the members of the city council resigned their offices. This fact was returned by the marshal, and proceedings upon the mandamus thereupon ceased.

In May, 1869, another board of aldermen having been elected, Rees procured another writ of mandamus to be issued, which writ was served on all of the aldermen except one Holger, who was sick at the time of the service upon the others. No steps were taken to comply with the requisition of the writ. An order to show cause why the aldermen should not be punished for contempt, in not complying with its requirements, was obtained, and before its return day six of the aldermen resigned their offices, leaving in office but one more than a quorum, of whom the said Holger, upon whom the writ had not been served, was one. Various proceedings were had and various excuses made, the whole resulting in an order that the aldermen should at once levy and collect the tax; but before the order could be served on Holger, he resigned his office, and again the board was left without a quorum. Nothing was accomplished by their effort in aid of the plaintiff, but fines were imposed upon the recusant aldermen, which were ordered to be applied in discharge of the costs of the proceedings.

In October, 1870, the plaintiff obtained a third writ of mandamus, which resulted as the former ones had done, and

by the same means, on the part of the officers of the city. A special election was ordered to be held to fill the vacancies of the aldermen so resigning, but no votes were cast, except three in one ward, and the person for whom they were cast refused to qualify. The general truth of these facts was not denied. No part of the debt was ever paid.

In this state of things, the district of Wisconsin having been divided into an eastern and a western district, and the city of Watertown being in the latter, Rees brought suit in the latter district on his judgments obtained in the general district before the division, and got a new judgment upon them for $11,066.

He now filed a bill in the said western district, setting forth the above facts, the general truth of which was not denied; that the debt due to him had never been paid, and that, with an accumulation of fourteen years' interest, the same remained unpaid, and that all his efforts to obtain satisfaction of his judgments had failed. All this was equally undenied.

The bill set forth also certain acts of the legislature of Wisconsin, which, it was alleged, were intended to aid the defendant in evading the payment of its debts, and which, it seemed sufficiently plain, had had that effect, whatever might have been the intent of the legislature passing them.

The bill alleging that the corporate authorities were trustees for the benefit of the creditors of the city, and that the property of the citizens was a trust fund for the payment of its debts, and that it was the duty of the court to lay hold of such property and cause it to be justly applied, now prayed that the court would subject the taxable property of the city to the payment of the judgments. It asked specifically that a decree might be made, subjecting the taxable property of the citizens to the payment of the complainant's judgments, and that the marshal of the district might be empowered to seize and sell so much of it as might be necessary, and to pay over to him the proceeds of such sale.

The answer (or the argument made in the brief upon it) set up, among other things, "that the city of Watertown

contained a population of but 7553 inhabitants; that the value of its property was assessed at but little over a million of dollars; that the debt of the city is $750,000; that it was impossible for the city to pay this debt; that it was expected and provided that the railroad company would pay the bonds in question; that the city had compromised and settled a portion of its debt; that it had levied the taxes necessary to effect such compromise; and that it was ready to compromise all outstanding bonds and judgments at as high a. rate as can be collected of the people of Watertown; that there was no law to compel the retention of the office by aldermen to levy taxes; that the plaintiff took his chance of its being voluntarily done, and that not being voluntarily done there was no violation of law."

By the charter of the city of Watertown* it was thus enacted:

"Nor shall any real or personal property of any inhabitant of said city, or any individual or corporation, be levied upon or sold by virtue of any execution issued to satisfy or collect any debt, obligation, or contract of said city."

. The case was tried in June, 1872, before two judges, holding the Circuit Court, upon these questions:

"1. Whether, when the principal and interest on the bonds were unpaid, as well as the judgment, and there being no property on which to levy an execution, the plaintiff was confined to a remedy at law by mandamus or otherwise, to enforce the payment of his judgment recovered in this court.

"2. Whether it was competent for the court, as a court of equity, on the failure of the officers of the city of Watertown to levy the tax as required by law, referred to in the bill, through their neglect, refusal, absence, or resignation, to appoint the marshal of the court to levy and collect the tax to pay the judgment.

"3. Whether it was competent for the court, as a court of equity, to subject the taxable property situate within the corporate limits of the city of Watertown, in any way, to an assess-

---

* Private laws of Wisconsin, acts of 1856, chapter 237.

ment, in order to pay the judgment of this court referred to in the bill of complaint."

The judges were divided in opinion upon them and the bill was dismissed.

The case was now here on certificate of division and appeal, the error assigned being that the court dismissed the bill, when it ought to have given the relief prayed for.

*Messrs. H. W. and D. W. Tenney (with whom was Mr. S. U. Pinney), for the creditor appellant:*

The theory of the bill is that the complainant having established a clear legal right at law, and having demonstrated that he has no remedy there, it is the duty of a court of equity to devise and enforce an effectual remedy. This must be done through its own officers, because there are no others in existence capable of doing it.

The opposite theory is that the court can only command existing city officers to execute existing State tax laws, and if there are no such officers, the end of judicial power is reached.

We assert the right of the Federal court to take possession of a city, and sell it in its own way, without regard to State laws or State officers. And on the other side, the position is that the Federal court is powerless in this case to execute its judgments, except through instrumentalities provided by another sovereign; and that, these being withdrawn, the city may safely and effectually repudiate its debt.

That we have established a clear legal right will be admitted. Equally admitted will it be that, in good faith, through several years, we have tried with diligence, but in vain, every resource of the law, and that now and for a long time past there are no officers in existence capable of executing the command of the court to levy a tax, and that the city has no property subject to execution. What is our remedy at law, if we have one? Any further attempt at law would not only be fruitless to us, but would bring the court of law which sought to give it into ridicule.

Then comes the important question whether, all legal

remedies failing, the court of chancery can give us a remedy? This involves the original and ultimate powers of the court. Story says :*

"Perhaps the most general, if not the most precise description of a court of equity, in the English and American sense,' is, that it has jurisdiction in cases of rights recognized and protected by the municipal jurisprudence, where a plain, adequate, and *complete remedy cannot be had* in the courts of common law."

Now, a proceeding at law, which, after having been tried and retried, once, twice, and again, is found to be wholly worthless, cannot be called "an adequate and complete remedy.".

Looking through the specific enumeration of the cases in which equity acts, we find nothing substantially limiting the broad statement made by Story, or taking our case out of it. The very ground of the jurisdiction of equity is that there is a legal right and no legal remedy, and by necessity the jurisdiction must be coextensive with the reason. Finding that the general words and the reason of the law cover our case, and finding no limitation thereon, we may stop and ask our opponents to show where any limitation has been made, and why it should be made, to prevent the court from giving us redress in this case, as it does in others upon the same reason. Here is legal right and no legal remedy. If that ever gives jurisdiction, why not in this case? If the court *generally* takes jurisdiction on that ground, what is there to make this an exception?

Will it be said that in other cases there is a practicable remedy which the court can devise and enforce, but not in this? The persons and the property chargeable with this debt are within the territory habitually traversed by the marshal, and so within the reach of the court. The number of persons interested in resisting the execution of the decree of the court is not so great but that the court can summon

---

* 1 Equity Jurisprudence, § 33.

to its aid a hundred fold to execute it. The thing to be done is not so complex or extensive but that the court can handle it properly. Wherein, then, is the difficulty?

Are the proper parties before the court to entitle us to the relief we ask? The defendant is the same that contracted the debt. It is the same that was charged with the duty of paying it, and which alone had the power to take the property of the citizens for that purpose. It is the embodiment of the citizens to act for them in this matter, made and unmade by them at their pleasure, so far as filling the offices and controlling their action is concerned. It had authority to borrow the money for the citizens, to spend it for the citizens, and to defend against the payment of it at the expense of the citizens. In short, it had ample and exclusive authority to represent the citizens at every stage. The citizens are a numerous and fluctuating body, whom it would be impracticable to bring into court, and merely as representatives of a class, the officers upon whom the law requires process to be served, and whose duty it is made to take action in regard to it, have shown by their diligence that they are sufficient for that purpose.

It may be said that we hold in substance only a contract that the city officers will levy a tax for our benefit, and that the court has no power except to compel a specific performance of this agreement. Such was not the contract. The gist of the contract was to repay the money borrowed, and to this the contract to raise a tax was subsidiary. We are not seeking a specific performance through the means appointed, knowing it cannot be had, but, as in a creditor's bill, are seeking to reach assets in equity which cannot be reached at law. The case is the same as if any ordinary debtor, at the time of contracting his debt, had agreed that he would raise the money to pay it in a particular way, and then had disabled himself from raising the money in that way, having ample funds otherwise.

It may be said that the relief we ask involves an exercise of the taxing power, and that this is not a judicial power. We do not ask the court to exercise the power of taxation,

and we admit that in the proper sense of the word the court does not possess such a power. In some analogous cases, courts have spoken of " ordering the marshal to levy a *tax*," &c., and one of the questions certified here is, whether the court has power to appoint the marshal to levy and collect the *tax* which the city officers ought to have levied and collected. This makes it necessary to discriminate accurately the taxing power from that which we invoke.

In this ordinary sense of the word, the taxing power is a legislative power, and can only be exercised under and by virtue of that power, and by the particular officers and in the particular manner provided for by the legislature. But the power which we invoke and the rights which we assert are simpler than this. We say that the court has *jurisdiction* of the persons and the property in question, and of the case; and that it can, in any way which its wisdom may approve, subject the taxable property of the city to the payment of our debt, without the intervention of State taxing officers, and without regard to tax laws. The court has the subject-matter within its reach, and the persons representing it before its bar. It has property in sight, out of which it has adjudicated that this debt should be paid. It can see no restriction upon its power to lay hold of it and apply it to that purpose. Why should it fail to execute justice in the matter? It constantly hears controversies as to the title to lands, or the existence of liens or charges upon them, or equities respecting them, and finds no difficulty in handling the matter by its own officers, by sale, or passing of title, or otherwise, so as to accomplish what it has determined that justice requires. If an equitable charge existed against a tract of land owned in severalty by a thousand different persons, the court would not defeat the charge nor refuse jurisdiction because of the difficulty of settling the equities between so many defendants. That seems to us the only difficulty here, and not a very great one. And considering that the parties interested have by their own wrongful acts prevented the payment of this debt by the levy of a tax, which would have settled the equities between them perfectly, it

seems to us that we should not be delayed, much less defeated, by this difficulty.

Stating more specifically what remedy we think the court should give us, we may say that it might be something like this: The court might make a decree subjecting the taxable property of the city of Watertown to the payment of this debt, and ordering the marshal to make a list thereof from the best sources he could obtain, and as nearly as convenient like the last assessment roll, the same to be reported to the court. The court might then hear and settle objections to this list, apportion our claim upon the items thereof, as valued, and order the marshal to collect from each person or piece of property the amount apportioned thereto, or in default, to sell the property, or levy on the property of the persons in default, in the main following the analogy of the tax laws, but not too literally. In all the proceedings these things should be kept in mind: First, that the principal object is to give the complainant a simple and effectual remedy. Second, that the proceedings should be wholly in the control of the Federal court, and should not depend on the actions of any State or city officers. Third, that the State tax laws should be disregarded as a source of authority, and regarded as an analogy only so far as convenient. Fourth, that anything done for the purpose of settling equities between the defendants in interest is only a matter of grace, and should not be allowed to work any substantial injury to the complainant.

We suppose that the court might order the money to be made out of any of the taxable property in the city, leaving the citizens to settle the equities between themselves at their leisure; and perhaps that would be the best way.

There is a dearth of precedents on the point now raised. However, in *Welch* v. *St. Genevieve*,* the court, in a mandamus case, ordered the marshal to levy and collect a tax to pay the debt. There was no State statute authorizing it. In *Supervisors* v. *Rogers*,† the court issued a mandamus to

---

* 1 Dillon, 522.        † 7 Wallace, 175.

the marshal " commanding him to levy and collect the taxes named in said peremptory writ," &c. But there was a State statute authorizing the court to " direct that the act required to be done may be done by the plaintiff or some other person appointed by the court," and the proceeding was probably founded upon that.

*Mr. D. Hall (with whom was Messrs. M. H. Carpenter and H. L. Palmer), contra.*

Mr. Justice HUNT delivered the opinion of the court.

This case is free from the objections usually made to a recovery upon municipal bonds. It is beyond doubt that the bonds were issued by the authority of an act of the legislature of the State of Wisconsin, and in the manner prescribed by the statute. It is not denied that the railroad, in aid of the construction of which they were issued, has been built, and was put in operation.

Upon a class of the defences interposed in the answer and in the argument* it is not necessary to spend much time. The theories upon which they proceed are vicious. They are based upon the idea that a refusal to pay an honest debt is justifiable because it would distress the debtor to pay it. A voluntary refusal to pay an honest debt is a high offence in a commercial community and is just cause of war between nations. So far as the defence rests upon these principles we find no difficulty in overruling it.

There is, however, a grave question of the power of the court to grant the relief asked for.

We are of the opinion that this court has not the power to direct a tax to be levied for the payment of these judgments. This power to impose burdens and raise money is the highest attribute of sovereignty, and is exercised, first, to raise money for public purposes only; and, second, by the power of legislative authority only. It is a power that has not been extended to the judiciary. Especially is it be-

---

* Stated *supra*, pp. 109–110.

yond the power of the Federal judiciary to assume the place of a State in the exercise of this authority at once so delicate and so important. The question is not entirely new in this court.

In the case of *Supervisors* v. *Rogers,** an order was made by this court appointing the marshal a commissioner, with power to levy a tax upon the taxable property of the county, to pay the principal and interest of certain bonds issued by the county, the payment of which had been refused. That case was like the present, except that it occurred in the State of Iowa, and the proceeding was taken by the express authority of a statute of that State. The court say: "The next question is as to the appointment of the marshal as a commissioner to levy the tax in satisfaction of the judgment. This depends upon a provision of the code of the State of Iowa. This proceeding is found in a chapter regulating proceedings in the writ of mandamus, and the power is given to the court to appoint a person to discharge the duty enjoined by the peremptory writ which the defendant had refused to perform, and for which refusal he was liable to an attachment, and is express and unqualified. The duty of levying the tax upon the taxable property of the county to pay the principal and interest of these bonds was specially enjoined upon the board of supervisors by the act of the legislature that authorized their issue, and the appointment of the marshal as a commissioner in pursuance of the above section is to provide for the performance of this duty where the board has disobeyed or evaded the law of the State and the peremptory mandate of the court."

The State of Wisconsin, of which the city of Watertown is a municipal corporation, has passed no such act. The case of *Supervisors* v. *Rogers* is, therefore, of no authority in the case before us. The appropriate remedy of the plaintiff was and is a writ of mandamus.† This may be repeated as often as the occasion requires. It is a judicial writ, a part of a recognized course of legal proceedings. In the present

---

* 7 Wallace, 175.          † Riggs v. Johnson County, 6 Wallace, 193.

case it has been thus far unavailing, and the prospect of its future success is, perhaps, not flattering. However this may be, we are aware of no authority in this court to appoint its own officer to execute the duty thus neglected by the city in a case like the present.

In *Welch* v. *St. Genevieve*,\* at a Circuit Court for the district of Missouri, a tax was ordered to be levied by the marshal under similar circumstances. We are not able to recognize the authority of the case. No counsel appeared for the city (Mr. Reynolds as *amicus curiæ* only); no authorities are cited which sustain the position taken by the court; the power of the court to make the order is disposed of in a single paragraph, and the execution of the order suspended for three months to give the corporation an opportunity to select officers and itself to levy and collect the tax, with the reservation of a longer suspension if it should appear advisable. The judge, in delivering the opinion of the court, states that the case is without precedent, and cites in support of its decision no other cases than that of *Riggs* v. *Johnson County*,† and *Lansing* v. *Treasurer*.‡ The first case cited does not touch the present point. The question in that case was whether a mandamus having been issued by a United States court in the regular course of proceedings, its operation could be stayed by an injunction from the State court, and it was held that it could not be. It is probable that the case of *Supervisors* v. *Rogers*§ was the one intended to be cited. This case has already been considered.

The case of *Lansing* v. *Treasurer* (also cited), arose within the State of Iowa. It fell within the case of *Supervisors* v. *Rogers*, and was rightly decided because authorized by the express statute of the State of Iowa. It offered no precedent for the decision of a case arising in a State where such a statute does not exist.

These are the only authorities upon the power of this

---

\* 10 American Law Register, New Series, 512.          † 6 Wallace, 166.

‡ 9 American Law Register, N. S. 415.          § 7 Wallace, 175.

court to direct the levy of a tax under the circumstances existing in this case to which our attention has been called.

The plaintiff insists that the court may accomplish the same result under a different name, that it has jurisdiction of the persons and of the property, and may subject the property of the citizens to the payment of the plaintiff's debt without the intervention of State taxing officers, and without regard to tax laws.  His theory is that the court should make a decree subjecting the individual property of the citizens of Watertown to the payment of the plaintiff's judgment; direct the marshal to make a list thereof from the assessment rolls or from such other sources of information as he may obtain ; report the same to the court, where any objections should be heard; that the amount of the debt should be apportioned upon the several pieces of property owned by individual citizens; that the marshal should be directed to collect such apportioned amount from such persons, or in default thereof to sell the property.

As a part of this theory, the plaintiff argues that the court has authority to direct the amount of the judgment to be wholly made from the property belonging to any inhabitant of the city, leaving the citizens to settle the equities between themselves.

This theory has many difficulties to encounter.  In seeking to obtain for the plaintiff his just rights we must be careful not to invade the rights of others.  If an inhabitant of the city of Watertown should own a block of buildings of the value of $20,000, upon no principle of law could the whole of the plaintiff's debt be collected from that property. Upon the assumption that individual property is liable for the payment of the corporate debts of the municipality, it is only so liable for its proportionate amount.  The inhabitants are not joint and several debtors with the corporation, nor does their property stand in that relation to the corporation or to the creditor.  This is not the theory of law, even in regard to taxation.  The block of buildings we have supposed is liable to taxation only upon its value in proportion to the value of the entire property, to be ascertained by

assessment, and when the proportion is ascertained and paid, it is no longer or further liable. It is discharged. The residue of the tax is to be obtained from other sources. There may be repeated taxes and assessments to make up delinquencies, but the principle and the general rule of law are as we have stated.

In relation to the corporation before us, this objection to the liability of individual property for the payment of a corporate debt is presented in a specific form. It is of a statutory character.

The remedies for the collection of a debt are essential parts of the contract of indebtedness, and those in existence at the time it is incurred must be substantially preserved to the creditor. Thus a statute prohibiting the exercise of its taxing power by the city to raise money for the payment of these bonds would be void.* But it is otherwise of statutes which are in existence at the time the debt is contracted. Of these the creditor must take notice, and if all the remedies are preserved to him which were in existence when his debt was contracted he has no cause of complaint.†

By section nine of the defendant's charter it is enacted as follows: "Nor shall any real or personal property of any inhabitant of said city, or any individual or corporation, be levied upon or sold by virtue of any execution issued to satisfy or collect any debt, obligation, or contract of said city."

If the power of taxation is conceded not to be applicable, and the power of the court is invoked to collect the money as upon an execution to satisfy a contract or obligation of the city, this section is directly applicable and forbids the proceeding. The process or order asked for is in the nature of an execution; the property proposed to be sold is that of an inhabitant of the city; the purpose to which it is to be applied is the satisfaction of a debt of the city. The proposed remedy is in direct violation of a statute in existence

---

\* Van Hoffman *v.* City of Quincy, 4 Wallace, 535.

† Cooley, Constitutional Limitations, 285, 287.

when the debt was incurred, and made known to the creditor with the same solemnity as the statute which gave power to contract the debt.   All laws in existence when the contract is made are necessarily referred to in it and form a part of the measure of the obligation of the one party, and of the right acquired by the other.*

But independently of this statute, upon the general principles of law and of equity jurisprudence, we are of opinion that we cannot grant the relief asked for.   The plaintiff invokes the aid of the principle that all legal remedies having failed, the court of chancery must give him a remedy; that there is a wrong which cannot be righted elsewhere, and hence the right must be sustained in chancery.   The difficulty arises from too broad an application of a general principle.   The great advantage possessed by the court of chancery is not so much in its enlarged jurisdiction as in the extent and adaptability of its remedial powers.   Generally its jurisdiction is as well defined and limited as is that of a court of law.   It cannot exercise jurisdiction when there is an adequate and complete remedy at law.   It cannot assume control over that large class of obligations called imperfect obligations, resting upon conscience and moral duty only, unconnected with legal obligations.   Judge Story says,† "There are cases of fraud, of accident, and of trust which neither courts of law nor of equity presume to relieve or to mitigate," of which he cites many instances.   Lord Talbot says,‡ "There are cases, indeed, in which a court of equity gives remedy where the law gives none, but where a particular remedy is given by law, and that remedy bounded and circumscribed by particular rules, it would be very improper for this court to take it up where the law leaves it, and extend it further than the law allows."

Generally its jurisdiction depends upon legal obligations, and its decrees can only enforce remedies to the extent and in the mode by law established.   With the subjects of

---

* Cooley, Constitutional Limitations, 285.
† 1 Equity Jurisprudence, § 61.
‡ Heard *v.* Stanford, Cases Tempore Talbot, 174.

fraud, trust, or accident, when properly before it, it can deal more completely than can a court of law. These subjects, however, may arise in courts of law, and there be well disposed of.*

A court of equity cannot, by avowing that there is a right but no remedy known to the law, create a remedy in violation of law, or even without the authority of law. It acts upon established principles not only, but through established channels. Thus, assume that the plaintiff is entitled to the payment of his judgment, and that the defendant neglects its duty in refusing to raise the amount by taxation, it does not follow that this court may order the amount to be made from the private estate of one of its citizens. This summary proceeding would involve a violation of the rights of the latter. He has never been heard in court. He has had no opportunity to establish a defence to the debt itself, or if the judgment is valid, to show that his property is not liable to its payment. It is well settled that legislative exemptions from taxation are valid, that such exemptions may be perpetual in their duration, and that they are in some cases beyond legislative interference. The proceeding supposed would violate that fundamental principle contained in chapter twenty-ninth of Magna Charta, and embodied in the Constitution of the United States, that no man shall be deprived of his property without due process of law—that is, he must be served with notice of the proceeding, and have a day in court to make his defence.†

" Due process of law (it is said) undoubtedly means in the due course of legal proceedings, according to those rules and forms which have been established for the protection of private rights."‡    In the New England States it is held that a judgment obtained against a town may be levied upon and made out of the property of any inhabitant of the town. The suit in those States is brought in form against the inhabitants of the town, naming it; the individual inhabi-

---

* 1 Story's Equity Jurisprudence, § 60.

† Westervelt *v.* Gregg, 12 New York, 209.    ‡ Ib.

tants, it is said, may and do appear and defend the suit, and hence it is held that the individual inhabitants have their day in court, are each bound by the judgment, and that it may be collected from the property of any one of them.* This is local law peculiar to New England. It is not the law of this country generally, or of England.† It has never been held to be the law in New York, in New Jersey, in Pennsylvania, nor, as stated by Mr. Cooley, in any of the Western States.‡ So far as it rests upon the rule that these municipalities have no common fund, and that no other mode exists by which demands against them can be enforced, he says that it cannot be considered as applicable to those States where provision is made for compulsory taxation to satisfy judgments against a town or city.§

The general principle of law to which we have adverted is not disturbed by these references. It is applicable to the case before us. Whether, in fact, the individual has a defence to the debt, or by way of exemption, or is without defence, is not important. To assume that he has none, and, therefore, that he is entitled to no day in court, is to assume against him the very point he may wish to contest.

Again, in the case of *Emeric* v. *Gilman*, before cited, it is said: "The inhabitants of a county are constantly changing; those who contributed to the debt may be non-residents upon the recovery of the judgment or the levy of the execution. Those who opposed the creation of the liability may be subjected to its payment, while those, by whose fault the burden has been imposed, may be entirely relieved of responsibility. . . . To enforce this right against the inhabitants of a county would lead to such a multiplicity of suits as to render the right valueless." We do not perceive, if the doctrine contended for is correct, why the money might not be entirely made from property owned by the creditor him-

---

* See the cases collected in Cooley's Constitutional Limitations, 240–245.

† Russel *v.* Men of Devon, 2 Term, 667.

‡ See Emeric *v.* Gilman, 10 California, 408, where all the cases are collected.

§ Cooley's Constitutional Limitations, 246.

self, if he should happen to own property within the limits of the corporation, of sufficient value for that purpose.

The difficulty and the embarrassment arising from an apportionment or contribution among those bound to make the payment we do not regard as a serious objection. Contribution and apportionment are recognized heads of equity jurisdiction, and if it be assumed that process could issue directly against the citizens to collect the debt of the city, a court of equity could make the apportionment more conveniently than could a court of law.*

We apprehend, also, that there is some confusion in the plaintiff's proposition, upon which the present jurisdiction is claimed. It is conceded, and the authorities are too abundant to admit a question, that there is no chancery jurisdiction where there is an adequate remedy at law. The writ of mandamus is, no doubt, the regular remedy in a case like the present, and ordinarily it is adequate and its results are satisfactory. The plaintiff alleges, however, in the present case, that he has issued such a writ on three different occasions; that, by means of the aid afforded by the legislature and by the devices and contrivances set forth in the bill, the writs have been fruitless; that, in fact, they afford him no remedy. The remedy is in law and in theory adequate and perfect. The difficulty is in its execution only. The want of a remedy and the inability to obtain the fruits of a remedy are quite distinct, and yet they are confounded in the present proceeding. To illustrate: the writ of *habere facias possessionem* is the established remedy to obtain the fruits of a judgment for the plaintiff in ejectment. It is a full, adequate, and complete remedy. Not many years since there existed in Central New York combinations of settlers and tenants disguised as Indians, and calling themselves such, who resisted the execution of this process in their counties, and so effectually that for some years no landlord could gain possession of his land. There was a perfect remedy at law, but through fraud, violence, or crime its execution was pre-

---

* 1 Story's Equity Jurisprudence, § 470 and onwards.

vented. It will hardly be argued that this state of things gave authority to invoke the extraordinary aid of a court of chancery. The enforcement of the legal remedies was temporarily suspended by means of illegal violence, but the remedies remained as before. It was the case of a miniature revolution. The courts of law lost no power, the court of chancery gained none. The present case stands upon the same principle. The legal remedy is adequate and complete, and time and the law must perfect its execution.

Entertaining the opinion that the plaintiff has been unreasonably obstructed in the pursuit of his legal remedies, we should be quite willing to give him the aid requested if the law permitted it. We cannot, however, find authority for so doing, and we acquiesce in the conclusion of the court below that the bill must be dismissed.

JUDGMENT AFFIRMED.

Mr. Justice CLIFFORD, with whom concurred Mr. Justice SWAYNE, dissenting:

I dissent from the opinion of the court in this case upon the ground that equity will never suffer a trust to be defeated by the refusal of the trustee to administer the fund, or on account of the misconduct of the trustee, and also because the effect of the decree in the court below, if affirmed by this court, will be to give judicial sanction to a fraudulent repudiation of an honest debt. For which reasons, as it seems to me, the decree of the subordinate court should be reversed.